## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **In re:** | : | **CHAPTER 11** |
| | : | |
| **ROTONDO WEIRICH ENTERPRISES, INC.** | : | **BANKRUPTCY NO. 15-16146(ELF)** |
| Debtor | : | |
| **In re:** | : | **CHAPTER 11** |
| **ROTONDO WEIRICH, INC.** | : | **BANKRUPTCY NO. 15-16147(ELF)** |
| Debtor | : | |
| **In re:** | : | **CHAPTER 11** |
| **THREE NORTH POINTE ASSOCIATES, LLC** | : | **BANKRUPTCY NO. 15-16148(ELF)** |
| Debtor | : | |
| **In re:** | : | **CHAPTER 11** |
| **RW LEDERACH, LLC** | : | **BANKRUPTCY NO. 15-16149(ELF)** |
| Debtor | : | |
| **In re:** | : | **CHAPTER 11** |
| **RW 675, LLC** | : | **BANKRUPTCY NO. 15-16150(ELF)** |
| Debtor | : | |
| **In re:** | : | **CHAPTER 11** |
| **RW MOTORSPORTS, INC.** | : | **BANKRUPTCY NO. 15-16151(ELF)** |
| Debtor | : | |

**DECLARATION OF STEVEN WEIRICH, PRESIDENT OF THE DEBTORS
IN SUPPORT OF FIRST DAY MOTIONS**

I, STEVEN WEIRICH, hereby declare under penalty of perjury:

1. I am the President and/or managing member of Rotondo Weirich Enterprises, Inc. ("RWE"), Rotondo Weirich, Inc. ("RWI"), Three North Pointe Associates, LLC ("3NP"), RW Lederach, LLC ("RWL"), RW 675, LLC ("RW675") and RW Motorsports, Inc. ("RWM"), each a debtor and debtor-in-possession in the above captioned chapter 11 cases (RWE, RWI, 3NP, RWL, RW675 and RWM are collectively referred to as the "Debtors").  In this capacity, I am generally familiar with the Debtors' day to day operations, businesses and financial affairs, and books and records.

2. On August 27, 2015 (the "Petition Date"), each of the Debtors filed a voluntary petition with the United States Bankruptcy Court for the Eastern District of Pennsylvania under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 et. seq. (the "Bankruptcy Code").  The Debtors are operating their businesses and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  Concurrently with the filing of this declaration (the "Declaration"), the Debtors are seeking procedural and joint administration of these chapter 11 cases.

3. To enable the Debtors to minimize the adverse effects of the commencement of these chapter 11 cases on their businesses, the Debtors have requested various types of relief in their "first day" motions and applications (each, a "First Day Motion").  The First Day Motions seek relief intended to allow the Debtors to effectively transition into chapter 11 and minimize disruption of the Debtors' business operations, thereby preserving and maximizing the value of the Debtors' estates.

4. I am familiar with the contents of each First Day Motion (including the exhibits and schedules thereto), and I believe that the relief sought in each First Day Motion: (a) is necessary to enable the Debtors to operate in chapter 11 with minimal disruption or loss of

2

productivity and value; (b) constitutes a critical element to achieving a successful reorganization of the Debtors; and (c) best serves the Debtors' estates and creditors' interests. Except as otherwise indicated, all facts set forth herein are based upon my personal knowledge of the Debtors' operations and finances, information learned from my review of relevant documents, and information supplied to me by other members of the Debtors' management and the Debtors' advisors. I am authorized to submit this Declaration on behalf of the Debtors, and, if called upon to testify, I could and would testify competently to the facts set forth herein.

5. Part I of this Declaration describes the Debtors' businesses, their capital and corporate structures and the circumstances surrounding the commencement of these chapter 11 cases. Part II sets forth the relevant facts in support of each of the First Day Motions.[1]

## BACKGROUND

A. **Commencement of Chapter 11 Cases**

6. On the Petition Date, each of the Debtors filed a voluntary petition with the United States Bankruptcy Court for the Eastern District of Pennsylvania under chapter 11 of title 11 of the Bankruptcy Code. The Debtors are operating their businesses and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. Concurrently with the filing of this declaration (the "Declaration"), the Debtors are seeking procedural and joint administration of these chapter 11 cases.

B. **The Debtors' Business**

7. RWE was formed in 1996 by Mario Rotondo and myself, each an equal owner.

8. RWE is a specialty contractor engaged in the production of precast, prefinished

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the relevant First Day Motion.

3

modular concrete products incorporated into the construction of projects within the United States and internationally.  RWE is unique in that it is considered to be the world's only true mobile modular precaster.  For most projects, RWE's modules are produced at an onsite manufacturing facility that is created and devoted to the project at hand and staffed with professionals who are specifically assigned to that project.

9. RWE provides integrated turnkey security solutions for correctional facilities, government and military applications, universities, schools and residential housing.  RWE has produced over 55,000 precast concrete modules for a variety of clients, ranging from private and public sector, correctional facilities and residential housing.

10. Precast concrete modular construction has become the building method of choice for a variety of owners and developers who seek optimum life-cycle cost results.  The benefits of concrete modular construction include, (i) speed, construction schedules are reduced by months, even years, with modular solutions, (ii) strength, monolithically poured modules are ideal for high seismic zones and high weather risk locations, (iii) durability, concrete modular solutions are resilient to prevent early deterioration, while withstanding heavy traffic and severe use, and (iv) sustainability, concrete modular solutions incorporate core elements of sustainable construction, including optimal energy performance plus environmentally effective use of local materials and resources.

11. RWE is the common pay agent for labor and other costs associated with related party contracts as well as general and administrative costs incurred by the Debtors.

12. RWI was formed in 1994 and owns the machinery and equipment utilized by RWE in the operation of its business.

13. 3NP was formed in 2001, and purchased land and a building in West Virginia.

The facilities owned by 3NP are used to store and fabricate concrete products, molds and equipment utilized by RWE in the operation of its business.

14. In 2003, RWL purchased the main office building in Lederach, Pennsylvania which is where the corporate offices of the Debtors are located.

15. In 2009, RW 675 purchased an additional office building in Lederach, Pennsylvania adjacent to the RWL property which is also used by the Debtors and portions are leased to unrelated entities.

16. RWMS is a professional race car operating team which began operations in 1999. RWMS does not presently actively operate a race car team.

17. In 2013, RWE formed a subsidiary CML RW Security, LLC ("CML-RW"), a Delaware Corporation. CML-RW provides detention equipment and security electronics services for correctional facilities, government buildings and military facilities. RWE owned 56% of the membership interests in CML-RW until March 20, 2015 of this year when RWE sold its interest in CML-RW.

C. **The Debtors' Business**

18. I have been involved in the precast business for over thirty (30) years and for the last 21 years as President of RWI and its affiliated companies.

19. The Debtors' executive offices are located in Lederach, PA. Presently, the Debtors employ approximately 35 persons.

20. All full time employees are eligible to participate in the health insurance program and the 401(k) program.

21. As of July 31, 2015, the Debtor's primary assets consisted of net cash of $75,500; accounts receivable of approximately $6,200,000; property, plant, & equipment of

5

$4,825,000, and molds valued at approximately $6,000,000.

### D. The Debtors' Corporate Structure

22. RWE, RWI, and RWM are Pennsylvania corporations and RWL and RW 675 are Pennsylvania limited liability companies. 3NP is a West Virginia limited liability company. RWE is the sole owner of all the equity interests in 3NP, RWL, RW 675 and RWMS. Mario Rotondo and I each own 50% of RWE and RWI.

### E. The Debtors' Capital Structure

23. As of the Petition Date, the Debtors' total consolidated senior debt obligations are approximately $4.4 million and consisted of, among other things, revolving credit facilities, and two term loans. The major components of the Debtors' consolidated debt obligations are described in greater detail below.

24. <u>Revolving Credit Facility</u>. On November 17, 2008, RWE entered into that certain Credit Agreement (the "Univest Line of Credit") with Univest Bank and Trust Company ("Univest Bank"), providing for a revolving credit facility of up to $4.0 million, as amended. As of the Petition Date, outstanding principal obligations under the Univest Line of Credit were approximately $4.0 million.

25. <u>RW 675 Term Loan</u>. On March 26, 2009, RW 675 executed and delivered to Univest Bank a Promissory Note in the original principal amount of $318,750, as amended (the "RW 675 Term Loan"). As of the Petition Date, outstanding principal obligations under the RW 675 Term Loan were approximately $218,738.

26. <u>RWL Term Loan</u>. On April 30, 2013, RWL executed and delivered to Univest Bank a Promissory Note in the original principal amount of $450,000, as amended (the "RWL

6

Term Loan").   As of the Petition Date, outstanding principal obligations under the RWL Term Loan were approximately $124,033.

27. <u>Weirich Term Loan</u>.  On August 19, 2014, my wife and I executed and delivered to Univest Bank a Promissory Note in the original principal amount of $325,000, as amended (the "Weirich Term Loan").   As of the Petition Date, outstanding principal obligations under the Weirich Term Loan were approximately $324,000.  All of the monies advanced Univest Bank under the Weirich Term Loan were advanced by my wife and me to RWE and its affiliated entities.  In connection with the advance of the Weirich Term Loan, RWE, RWI, 3NP, RWL, RW 675, RWMS, certain affiliated non-debtor entities and the sureties of these credit facilities entered into a Cross Default Agreement, whereby all of the borrowers and guarantors agreed that a default occurring under any one of the credit facilities shall constitute a default under all the credit facilities.

28. <u>Security</u>.  Univest Bank asserts that the Univest Line of Credit, the RW 675 Term Loan, and the RWL Term Note (collectively, the "Pre-Petition Credit Facilities") are secured by all present and future accounts, chattel paper, contracts, documents, inventory, the real estate owned by RWL, RW 675 and 3NP, equipment and accessions, general intangibles, instruments, and any proceeds and products of the foregoing located in all business locations.  Debtors' counsel is reviewing the Univest Loan Documents and has not yet had adequate time to confirm the extent, validity and priority of the Univest Bank liens and interests.

29. As of the Petition Date, the RWE Debtor also had accrued payroll obligations of approximately $213,883 inclusive of accrued payroll tax obligations of $98,000.

30. The unpaid aggregate liability of the Debtors to Univest Bank under the Pre-Petition Credit Facilities excluding accrued interest and reasonable counsel fees as of the Petition Date is approximately $4,400,000.

31. As of the Petition Date, the Debtors had approximately $8,000,000 of unsecured trade payables.

F. **Events Leading to a Chapter 11 Filing**

32. The Debtors' business has experienced a reduction in contract revenues and a substantial loss in excess of $6 million dollars on the Mule Creek project in California. Further, owners and general contractors have failed to pay within the contract terms which have caused severe cash flow problems including the Debtors inability to stay current on its payroll and payroll tax obligations.

33. The Debtors are also facing collection complaints in different venues.

34. In addition, certain of the Pre-Petition Credit Facilities matured which resulted in Univest Bank earlier this month declaring all the Pre-Petition Credit Facilities in default.

35. As a result, the Debtors were placed in the untenable position of potentially seeing their businesses shutdown. The Debtors decided to file for Chapter 11 protection to preserve their going concern value and to reorganize their affairs.

H. **The Debtors' Objectives In Chapter 11**

36. During the Chapter 11 proceedings, the Debtors intend to continue the operation of their businesses, while at the same time reducing overhead and related operational costs. The Debtors have interviewed investment bankers and anticipate retaining an investment banking firm in the near future to assist the Debtors in exploring all of their strategic options both within the United States and internationally so as to maximize the

8

value of its business.

37. The relief requested in the First Day motions is necessary to allow the Debtors to stabilize their affairs as they transition into Chapter 11. Therefore, it is respectfully requested that the Court grant each of the First Day Motions and enter the proposed Orders accompanying each Motion.

## First Day Motions

I. **Procedural Motions**

    A. **Motion of the Debtors for an Order Directing Joint Administration of Their Related Chapter 11 Cases**

36. The Debtors in these chapter 11 cases are affiliated entities, 3NP, RWL, RW 675 and RWM are all wholly owned subsidiaries of RWE. Mario Rotondo and I each own 50% of RWE and RWI.

38. The Debtors request that, in light of the fact that each of these Debtors have filed petitions before this Court, the Court can and should jointly administer these chapter 11 cases. I believe that jointly administering these chapter 11 cases: (a) will ease the administrative burden on the Court and the parties; (b) will protect creditors of different estates; and (c) will simplify the United States Trustee's supervision of the administrative aspects of the chapter 11 cases. Accordingly, I believe that joint administration is in the best interests of the Debtors' estates.

    II. **Operational Motions**

    A. **Motion of Debtors for an Order Pursuant to 11 U.S.C. 363(c) and Fed.R.Bankr.P. 4001, Authorizing Debtors to Use Cash Collateral and Provide Adequate Protection**

39.   The Debtors require the ability to use cash and the proceeds of existing accounts receivable to maintain the operation of their business and preserve its value as a going concern. These essential items, however, constitute part of Univest Bank's collateral and, therefore, may not be used in support of the Debtors' ongoing business activities absent compliance with Section 363 of the Bankruptcy Code or the consent of Univest Bank.

40.   In accordance with Section 363 of the Bankruptcy Code, the Debtors request that the Court authorize the Debtors' use of Cash Collateral for an interim period, pending a final hearing on the Debtors' use of Cash Collateral.

41.   The Debtors request authority to use cash collateral in the amount to be set forth on a budget which is being negotiated with Univest Bank and will be submitted to the Court on or before the hearing date for the cash collateral Motion. The use of cash collateral is necessary in order for the Debtors to be able to operate and pay their post-petition obligations as they come due.

**B.   Motion of Debtors for an Order (A) Authorizing the Debtors to Pay Certain Pre-Petition (I) Wages, Salaries, and Other Compensation, (II) Reimbursable Employee Expenses, And (III) Employee Medical And Similar Benefits; (B) Confirming that the Debtor May Continue Pre-Petition Employee Programs in the Ordinary Course of Business; and (C) Directing Banks and Other Financial Institutions to Honor all Related Checks and Electronic Payment Requests**

(i)   Employees, Programs and Benefits

42.   As of the Petition Date, the Debtor employed approximately thirty-five (35) employees, of whom approximately thirty-one (31) are full-time employees (the "Employees") and approximately four (4) are part-time employees.

43.   The Employees perform a variety of critical functions including purchasing, accounting, human resources, manufacturing, construction services, and other tasks. The Employees' skills and their knowledge and understanding of the Debtors' operations, customer relations, and infrastructure are essential to the Debtors' business.

10

44. Just as the Debtors depend on their Employees to operate, the Employees depend on the Debtors. The vast majority of the Debtors' Employees rely exclusively on their compensation and benefits to continue to pay their daily living expenses and these Employees will be exposed to significant financial difficulties if the Debtors are not permitted to pay them their full unpaid compensation, benefits, and reimbursable expenses in the ordinary course of business.

45. To minimize the personal hardship that the Employees would suffer if pre-petition Employee-related obligations are not paid when due or as expected, and to maintain morale and stability in the Debtors' workforce during this critical time, the Debtors, by this Motion, seek authority to pay and honor, in their sole discretion, certain pre-petition claims for, among other items: wages, salaries, commissions, and other compensation, expense reimbursement, federal and state withholding taxes and other amounts withheld (including, garnishments, Employees' share of insurance premiums and taxes), health insurance benefits, vacation time, and all other benefits that the Debtors have historically provided in the ordinary course of business (collectively, and as more fully described below, the "Employee Obligations") and to pay all costs incident to the foregoing. In an abundance of caution, the Debtors request the right to modify, change, and discontinue any of its employee compensation, programs, policies and benefits, and to implement new programs, policies and benefits in the ordinary course of business during this Chapter 11 Case in its sole discretion without the need for further Court approval.

    (ii)    Employee Obligations

        a.    <u>Unpaid Compensation</u>

46. In the ordinary course of business, the Debtors incur payroll obligations to the Employees. Such obligations generally comprise wages, salaries and commissions, but may also include expense reimbursement. The Debtors generally pay their salaried Employees periodic payments for wages every other Friday, and most hourly employees are paid weekly.

47. The next payroll is scheduled to be paid on September 4, 2015 which is solely for hourly employees for the pay period that will end on August 30, 2015 is a gross payroll of approximately $13,515.

48. In addition, the Debtors were unable to pay the payroll that came due today, August 28, 2015. The August 28th payroll was comprised of two components: (a) hourly employees with a gross payroll of $15,251 for the one week pay period that ended on August 22 and (b) salaried employees with a gross payroll of $57,182 for the two week pay period that ended on August 23. The Debtors' are seeking authority to pay these wages as funds become available after the Petition Date.

49. Further, the payroll that will come due on September 11, 2015 will be for the two week pay period from August 23 to September 5, 2015. The portion of the September 11, 2015 payroll that relates to a pre-petition period is approximately $29,935 which the Debtors' are also seeking authority to pay as it comes due.

50. Because all of the Employees are paid in arrears and the Debtors were not able to pay the payroll that came due on August 28, 2015, as of the Petition Date the Employees were not paid all of their pre-petition wages and compensation. Additionally, some Employees may be entitled to compensation because some checks issued to Employees prior to the Petition Date

may not have been presented for payment or may not have cleared the banking system and, accordingly, have not been honored and paid as of the Petition Date (the "Uncashed Checks").

51. The Debtors estimate that, as of the Petition Date, there is approximately $115,883 in pre-petition accrued wages, and salaries earned prior to the Petition Date that remains unpaid (together with the Uncashed Checks and Reimbursable Expenses (as defined below) the "Unpaid Compensation"). As of the Petition Date, the Debtors believe that there may be uncashed payroll and employee reimbursement checks. The Debtors seek authority, but not direction, to pay the Unpaid Compensation, along with any costs associated therewith.

52. To the extent any other Unpaid Compensation exceeds the statutory priority cap imposed by sections 507(a)(4) and (5) of the Bankruptcy Code, such payments will be limited to $12,475. The Debtors are not hereby seeking authority to pay any of the Employees on account of pre-petition accrued wage or benefit obligations in excess of the $12,475 priority cap.

b. <u>Deductions and Withholdings</u>

53. During each applicable pay period, the Debtors routinely deduct certain amounts from Employees' paychecks, including, without limitation, (a) garnishments, child support, and similar deductions, and (b) other pre-tax and after-tax deductions payable pursuant to certain of the Employee benefit plans discussed herein (such as an Employee's share of health care benefits and insurance premiums (collectively, "Deductions"). The Debtors forward the amount of the Deductions to the appropriate third-party recipients. Due to the commencement of the Chapter 11 Case, however, certain Deductions that were deducted from Employees' earnings may not have been forwarded to the appropriate third-party recipients prior to the Petition Date. Accordingly, the Debtors request authority, but not direction, to forward any unpaid Deductions to the appropriate third party recipients and to

13

continue to forward these pre-petition Deductions to the applicable third party recipients on a post-petition basis, in the ordinary course of business as routinely done prior to the Petition Date. The Debtors also request authority, but not direction, to honor pre-petition checks associated with employee benefits.

54.     Further, the Debtors are required by law to withhold from an Employee's wages amounts related to federal, state and local income taxes, Social Security and Medicare taxes for remittance to the appropriate federal, state, or local taxing authority (collectively, the "Withheld Amounts"). The Debtors must then pay social security and Medicare taxes and pay, based on a percentage of gross payroll, additional amounts for federal and state unemployment insurance (collectively, the "Employer Payroll Taxes").

55.     Prior to the Petition Date, the Debtors withheld the appropriate amounts from Employees' earnings for the Withheld Amounts and the Employer Payroll Taxes (collectively, the "Payroll Taxes"), but such funds may not yet have been forwarded to the appropriate taxing authorities. The Debtors estimate that the accrued Payroll Taxes total $98,000. The Debtors request authority, but not direction, to forward any outstanding Payroll Taxes to the appropriate third parties, and to continue to honor and process the pre-petition payments for Payroll Taxes on a post-petition basis, in the ordinary course of business, as routinely done prior to the Petition Date.

     c. <u>Honoring Checks for, and Payment of, Reimbursable Expenses</u>

56.     Prior to the Petition Date and in the ordinary course of its operations, the Debtors reimbursed Employees for certain reasonable and customary expenses incurred on behalf of the Debtors in the scope of their employment (the "Reimbursable Expenses"). The Reimbursable Expenses include (a) travel expenses for meals, hotels and rental cars, (b) business development expenses, (c) telephone expenses, (d) housing costs

14

while employee is onsite at a project, (e) car allowance in lieu of mileage, (f) project expenses that are incurred for the purchase of tools and/or materials at a project by an employee utilizing his personal credit card and (g) other organization-related expenses that are paid by the Employees. As of the Petition Date, the Debtors have approximately $48,000 in pending requests for expense reimbursement. In addition, it is possible that certain Employees may have incurred pre-petition expenses for which they have not yet submitted requests for reimbursement and will submit such requests to the Debtors after the Petition Date. The Debtors estimate that the amount of the additional post-petition requests for reimbursement of pre-petition expenses will be an additional $25,000.

57. Reimbursable Expenses are all incurred on the Debtors' behalf and with the understanding that they will be reimbursed. Accordingly, to avoid harming Employees who may have incurred the Reimbursable Expenses, the Debtors request authority, to be exercised in its sole discretion, to (a) continue paying Reimbursable Expenses in accordance with pre-petition practices, (b) modify its pre-petition policies relating thereto as they deem appropriate, and (c) pay all Reimbursable Expenses that relate to the pre-petition period and are submitted to the Debtors post-petition.

(iii)  Employee Benefits

58. The Debtors offer Employees the ability to participate in a number of discretionary insurance and benefits programs, including health care and a 401(k) Plan (collectively, the "Employee Benefit Programs").

a. Health Insurance Plan

59. The Debtors offer third party carrier health insurance to its Employees for medical and dental coverage subject to the employee paying 25% of the premium (collectively, the "Health Insurance").

15

60. By this Motion, the Debtors seeks authority, in its sole discretion, to (a) continue the Health Insurance for its Employees in the ordinary course of business, (b) continue making contributions to such benefit programs, and (c) pay any amounts related thereto, including on account of any premiums, claim amounts, and administration fees to the extent that they remain unpaid as of the Petition Date.

b. <u>Vacation, and Other Leaves of Absence</u>

61. The Debtors provide vacation time to its Employees as a paid time-off benefit (the "Vacation Time"). The amount of Vacation Time available to a particular Employee and the rate at which such Vacation Time accrued is generally determined by the Employee's length of employment. When an Employee elects to take Vacation Time, that Employee is paid his or her regular hourly or salaried rate. Vacation Time not used is carried over to the next year but is forfeited if not used within six (6) months of that next year.

62. The Debtors also allow its Employees to take certain other leaves of absence for personal reasons, many of which are required by law ("Leaves of Absence"). Leaves of Absence include sick leave, family medical leaves, pregnancy, adoption and foster care leaves, military leaves, jury duty, voting leaves, personal leaves, and bereavement leaves. Only full-time Employees are eligible for Leaves of Absence.

63. By this Motion, the Debtors request that they be authorized, but not directed, to continue to honor their Vacation Time and Leaves of Absence policies in the ordinary course of business, and to honor and pay any pre-petition amounts related thereto. Moreover, the Debtors anticipate that its Employees will utilize any accrued Vacation Time and Leaves of Absence in the ordinary course of business, which will not create any material cash flow requirements beyond the Debtors' normal payroll obligations.

16

c.     Employee Retirement Plan

64.     The Debtors maintain a traditional 401(k) retirement plan meeting the requirements of the Internal Revenue Code for the benefit of Employees (the "Retirement Plans").  The Retirement Plans allow for deductions of eligible compensation up to the limits set by the Internal Revenue Code.  Post-petition, the Debtor will not match the Employees' contributions.

65.     By this Motion, the Debtors seek confirmation that they may continue the Retirement Plans in the ordinary course of business, and requests authority to pay any amounts owed as of the Petition Date.

**E.     Motion for Entry of Interim and Final Orders: Prohibiting Utility Companies from Discontinuing, Altering or Refusing Services; (II) Deeming Utility Companies To Have Adequate Assurance of Payment; and (III) Establishing Procedures for Determining Requests for Additional Assurance Pursuant to 11 U.S.C. § 366**

66.     In connection with the operation of their businesses, the Debtors obtain electric, water, telephone, internet and other similar utility services provided by a number of utility companies (the "Utility Companies").

67.     Preserving utility services on an uninterrupted basis is essential to the Debtors' ongoing operations and, therefore, to the success of their reorganization.  Indeed, any interruption of utility services, even for a brief period of time, would disrupt the Debtors' operations.  Such a result could seriously jeopardize the Debtors' reorganization efforts and, ultimately, their enterprise value and creditor recoveries.  It is, therefore, critical that utility services continue uninterrupted during these chapter 11 cases.

### H. Motion for an Order Extending Debtors' Time to File Schedules and Statements of Financial Affairs Pursuant to Fed.R.Bankr.P. 1007(c)

68. Prior to the Petition Date, the Debtors and their professionals have focused on numerous tasks relating to these Chapter 11 cases, including: (a) reviewing documents, (b) analyzing the Debtors' cash flow projections; (c) addressing issues relating to the Debtors' various financial obligations; (d) negotiating with its secured lender, Univest Bank, and other parties to obtain post-petition financing; (e) negotiating with potential buyers of the Debtors' assets; and (f) preparing the Debtors' various "First Day Motions". In addition, the Debtors' combined have in excess of four hundred (400) creditors.

69. As a result, the Debtors and their professionals have yet to complete the Schedules and SOFA and anticipate that such documents may not be completed by the 14 day deadline established by the Bankruptcy Rules. Rather than filing incomplete schedules, I believe obtaining an extension of time is warranted and will afford us adequate time to file the Schedules and Statements of Financial Affairs.

Date: August 28, 2015                        By:   /s/ Steven Weirich
                                                    STEVEN WEIRICH